IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EARL LEHMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 09-1542 |
| | ) |
| VICTORIA FIRE & CASUALTY | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

Pending before the Court is a motion for partial summary
judgment brought by Defendant Victoria Fire & Casualty Insurance
Company ("Victoria"), pursuant to Fed. R. Civ. P. 56 (Doc. No. 22.)
For the reasons discussed below, Defendant's motion is granted.
Moreover, inasmuch as the Court concludes that with dismissal of
Plaintiff's bad faith claim it no longer has subject matter
jurisdiction, the case is remanded to the Court of Common Pleas of
Allegheny County.

## I. BACKGROUND

### A. Factual Background[1]

1. *Events occurring on the night of November 15-16, 2008:*
Plaintiff Earl Lehman, a resident of the Hazelwood neighborhood of
Pittsburgh, Pennsylvania, worked as an independent contractor for
a company called Halbleib's Auto Body and Service ("Halbleib"), also
located in Hazelwood. Under a lease agreement with Mr. Lehman, the
repair shop purchased a 2007 GMC pickup truck which Mr. Lehman used
in his tow-truck business. Mr. Lehman attached his own vehicle bed
to the truck and provided at his own expense a variety of equipment
commonly used in the business, e.g., lockout equipment, jacks, tow
chains, and emergency equipment. Mr. Lehman was responsible for
maintenance of the truck, including insurance coverage. In October
2008, Mr. Lehman purchased a vehicle insurance policy from Defendant
which the parties agree was in effect on November 15-16, 2008 ("the
Policy;" *see* Exh. A to the Complaint.)

About two o'clock on the afternoon of Saturday, November 15,
2008, Mr. Lehman drove the truck to a wedding reception for a member
of his motorcycle riding club. He and several other members of the

---

[1] When considering a motion for summary judgment, the Court generally
summarizes the facts as they are agreed upon by the parties. Here, the
discrepancies between Plaintiff's accounts of the events precipitating
this claim and the results of Defendant's investigation are the crux of
Plaintiff's bad faith claim. The facts in this section are summarized
primarily from Plaintiff's point of view. Defendant's distinctions are
discussed in the analysis in Section IV. below.

club left the reception shortly before 11:00 p.m., intending to meet at a bar or back at their clubhouse to continue partying.[2] He then drove to a bar located on Lebanon Road in West Mifflin, Pennsylvania, called Spencer's Down Under ("Spencer's.") Mr. Lehman testified at his deposition that as he turned into Spencer's from Lebanon Road, another pickup was coming out of the parking lot and blocked his access. Plaintiff and the other driver first exchanged words while still in their trucks, then both drivers got out and began a physical altercation. Mr. Lehman knocked down the driver, then turned around to confront the passengers in the other pickup. As he did, "the lights went out." (Plaintiff's Appendix to Brief in Opposition to Motion for Partial Summary Judgment, Doc. No. 27, "Plf.'s App.," Exh. 11, Statement by Earl Lehman to Mary Egleton.)

The next thing Mr. Lehman remembers was waking up as his friend Carl Cordero, known to Plaintiff as "Chico," slapped him in the face. Whether they discussed the location of Mr. Lehman's truck at that point is not clear. Mr. Cordero then drove Mr. Lehman to the clubhouse where both continued to drink. Sometime between 4:00 and 5:00 a.m., when they decided to leave, Mr. Lehman asked his friend to take him back to his truck. Mr. Cordero told Plaintiff his truck

---

[2] The location where Mr. Lehman planned to meet other members of his riding club is a little vague. This is not surprising since he admitted to the investigating police officers, to the insurance company investigator, and at his deposition that even before he went to the reception, he was "totally drunk." *See* Def.'s App., Exh. A, Deposition of Earl Lehman, at 25.

3

was not in sight when he found Mr. Lehman at Spencer's and Plaintiff asked him to take him home. While en route, they saw Mr. Lehman's truck sitting on Second Avenue; the lights were on and the truck was running. Mr. Lehman got out of Mr. Cordero's vehicle, drove the tow-truck to Halbleib's parking lot, then walked a few blocks home.

Sometime the next morning, that is, Sunday, November 16, Mr. Lehman's roommate, Michael O'Malley, saw Mr. Lehman's truck as he walked past Halbleib's. He went home, woke Mr. Lehman, and asked him, "Do you know your truck is wrecked?" Mr. Lehman replied that the truck was not "wrecked," but did have a flat tire on the right front. When he went to Halblieb's, however, he realized the entire front right wheel was missing and the lower portion of the fender was bent in. He then called the Pittsburgh City Police.

Meanwhile, earlier Sunday morning, Pittsburgh City Police Officer Katherine Logue had responded to a report of a hit-and-run accident on Almeda Street, also in Hazelwood. According to her report, about 5:00 that morning, a resident heard a crash but did not get up to investigate. When he did go out to the street later that morning, he discovered that a Chevy Tahoe, along with an adjacent dumpster, had apparently been sideswiped. He also found an entire wheel which appeared to have been broken off the other vehicle. Officer Logue noticed a white scrape mark on the pavement that went from Almeda Street to Second Avenue and turned left. She was

4

familiar with the area and thought perhaps the damaged vehicle had been taken to a nearby repair shop. As she drove to that location, however, she again noticed the scrape marks on the street and followed them to Halbleib's. She saw the tow-truck sitting in the lot, identified its registration, and noted that the front wheel on the passenger side was missing. The tire on the wheel found at the site of the hit-and-run on Almeda Street was the same make of tire as those on the truck parked at Halbleib's. She consequently concluded that the tow-truck in the parking lot was the vehicle involved in the hit-and-run.

Later that same Sunday, Mr. Lehman returned to Spencer's Down Under and spoke with Thomas Exacustides, one of the owners of the bar. He told Mr. Exacustides that he had been beaten up in the bar's parking lot "by a bunch of bikers" and asked if there were a camera on the front of the building that might help him identify the men with whom he had been fighting. After determining the time of the fight, the bar owner told Mr. Lehman there were cameras covering both the inside of the bar and the parking lot. They went to the parking lot where Mr. Lehman showed Mr. Exacustides where he had parked and where the altercation had taken place. Mr. Exacustides explained that his security cameras would cover those locations so they could look at the tapes to determine exactly what had happened. At that point, Mr. Lehman responded, "Oh, maybe I was at a different bar on

5

Brownsville Road," and left. According to Mr. Exacustides' later testimony at his deposition, his security cameras that film the parking lot and the entrance to the bar did not show any altercation on the night of November 15, 2008, nor did they show any bikers.

2. *The police investigation and related events:* Shortly after 1:00 p.m. on November 16, Officer Richard Petak interviewed Mr. Lehman at his home and inspected the truck. According to the investigative report completed by Mr. Petak, Mr. Lehman told him that after leaving the reception, he had gone to a bar called Doug's Den on Lebanon Road in West Mifflin. As he entered the bar, three white males, apparently bikers, had made comments about a motorcycle vest Mr. Lehman was wearing, and a fight ensued in which Plaintiff was knocked unconscious. He was awakened by Mr. Cordero who told him his truck was missing. They then left Doug's Den and went to the clubhouse to have a few more beers. While driving home about 5:00 Sunday morning, they discovered his truck on Second Avenue, which he drove to Halbleib's.

After Officer Petak completed his report, the case was assigned to Detective Edward Synkowski, who interviewed Mr. Lehman at Halblieb's shop on Tuesday, November 18, 2008. In his deposition, Mr. Synkowski testified that Plaintiff's report to him was somewhat different from his original statement to Officer Petak. That is, Mr. Lehman told Detective Synkowski he went to Spencer's Down Under

6

about 11:00 p.m. on the night of November 15, had an altercation with three people as he was pulling into the parking lot, was knocked out, went to the bikers' clubhouse for several hours with Mr. Cordero, returned to the bar to discover his truck was missing, discovered the truck on Second Avenue while Mr. Cordero was driving him home, then drove the truck to Halbleib's.

Mr. Lehman returned to Spencer's a few days later and again asked if there were security cameras on the side of the building which would show the driveway area where the altercation took place; Mr. Exacustides told him there were not. After the police had reviewed the surveillance tapes, Mr. Synkowski told Mr. Lehman he was unable to find anyone who could verify that Plaintiff had been at Spencer's Down Under on the night of the incident. Mr. Lehman responded, "Maybe it wasn't that bar."

    3. *Victoria's investigation; subsequent events:* On December 3, 2008, John Halbleib, the legal owner of the truck, submitted an insurance claim to Victoria.[3] Mary Egleton, a Victoria claims representative, interviewed Mr. Lehman two days later. In his statement to Ms. Egleton, Plaintiff indicated that the incident had occurred in the parking lot at Spencer's and that Mr. Cordero

---

[3] Victoria Insurance is a member of the Nationwide chain of insurance companies and it appears that Ms. Egleton, Mr. Balsomico, and Mr. Harper are actually Nationwide employees. For ease of reference, the Court has substituted "Victoria" or "Defendant" when discussing actions taken by Nationwide.

had found him at the "entrance as you come in." He did not know if his truck was there when he regained consciousness, but they went to the clubhouse and partied until sometime around 4:00 or 5:00 in the morning. When Mr. Lehman asked Mr. Cordero to take him back to his truck, his friend asked him where it was. Mr. Lehman asked if the truck was not at Spencer's, and when told it was not, Mr. Lehman told Mr. Cordero to just drive him home.

Ms. Egleton referred the claim to the Special Investigative Unit ("SIU") where agent Jason Balsomico was assigned to make a more detailed investigation. Between December 7 and December 9, 2008, Mr. Balsomico spoke with Mr. Halbleib, reviewed the initial police report prepared by Mr. Petak, and spoke with Detective Synkowski who said he had reviewed the security tapes and there was no evidence of a fight or of anyone matching the description of Mr. Lehman at Spencer's that night. Also on December 9, Mr. Synkowski sent Mr. Balsomico a fax telling him the case was an ongoing police investigation and noted "We believe Lehman is not telling the truth."

Mr. Balsomico visited Spencer's where he interviewed Michelle Beal who had been tending bar at the time of the alleged incident. According to Ms. Beal, November 15 had been a normal Saturday evening, and no one had alerted her or the doorman that there had been a fight in the parking lot or that a truck had been stolen. She also stated that sometime after the incident, Mr. Lehman and some friends had

8

asked her about the location of the security cameras. When she replied that cameras were "everywhere," one of them said "Oh, sh-t." Mr. Balsomico took a recorded statement from Mr. Exacustides who said that when Mr. Lehman returned to the bar and talked with him about the cameras, Plaintiff could not recall if he had actually been at Doug's Den or Spencer's. After some delays, Mr. Balsomico was eventually able to get statements from Plaintiff and Mr. Cordero, an affidavit of vehicle theft, and a copy of the vehicle lease agreement between Halbleib and Mr. Lehman.

Based on its investigation, Victoria sent Mr. Lehman a letter on April 24, 2009. The letter quoted the provision of the Policy which precluded coverage in cases of concealment, misrepresentation or fraud, and then outlined several facts which Victoria believed supported its decision to deny coverage of the claim. In the letter, Ms. Egleton stated:

The facts include, but are not limited to, the following:

Per your recorded interview on 11/5/08 [sic], you advised SIU Jason Balsomic [sic] you were at a wedding all day and you arrived at Spence's [sic] around 11:00 p.m. When pulling in, you got into a verbal argument with a truck driver, and you got out and starting [sic] fighting with the driver. The other two occupants knocked you out and you did not recall how long you were out but your friend, Chico woke you up. You both left Spence's and went to your riding clubs [sic] "clubhouse". You advised that you left the clubhouse between 4:00 and 5:00 am and on the way home you spotted your vehicle in the street running.

9

1. SIU spoke to your roommate Mike O'Malley and he advised he was walking home from his son's house on 11/16/08 and saw extensive damage to insured's truck that was parked at Halbleib's and advised you of same when he got home.

2. On 12/9/08, SIU spoke to Spence's owner Thomas Exacustides and he advised that he reviewed the security tapes with the police department and you were never in the bar on 11/5/08 [sic] and he never saw a tow truck in the parking lot. Also, On[sic] 12/9/08 we received a copy of the Pittsburgh Police Report and spoke to Detective Synkowski who also reviewed the tapes, and advised there was no fight and he also did not see your vehicle in the parking lot.

3. On 12/9/08, SIU, Jason Balsomic [sic] interviewed Spence's bartender Michelle Beal who advised on 11/5/08 [sic] she never heard of any fight or a stolen vehicle and also never saw you in the bar that night.

(Plf.'s App., Exh. 3, Deposition of Jason Balsomico, Exh. 2.)

On May 5, 2009, a preliminary criminal hearing was held in the matter of Pennsylvania v. Lehman and Cordero. Plaintiff and Mr. Cordero were charged with making a false report to law enforcement authorities, leaving the scene of a hit-and-run accident, insurance fraud, and conspiracy to commit insurance fraud. (Plf.'s App., Exh. 2, Criminal Docket.) Officers Petak and Logue, Detective Synkowski, and Mr. Balsomico testified. (Id., Exh. 1, Transcript of Preliminary Criminal Hearing.) On March 18, 2010, all claims brought in the criminal action against Mr. Lehman and Mr. Cordero were dismissed. (Id., Exh. 2.)

B.    Procedural Background

Mr. Lehman filed suit on October 16, 2009, in the Court
of Common Pleas of Allegheny County, asserting claims for breach of
an insurance contract and for bad faith by an insurer under 42 Pa.
C.S. § 8371.    Pursuant to 28 U.S.C. § 1446, Defendant timely removed
the case to this Court on November 19, 2009, based on complete
diversity of the parties and an amount in controversy greater than
the statutory minimum.    Plaintiff did not object to removal.

Following unsuccessful mediation and extensive discovery,
Victoria filed the now-pending motion for summary judgment on the
bad faith claim only, contending that Plaintiff has failed to produce
the evidence required to support the elements of this cause of action.
The question has been fully briefed and is now ripe for decision.

## II.    JURISDICTION AND VENUE

The parties agree this Court has subject matter jurisdiction
pursuant to 28 U.S.C. § 1332(a), based on complete diversity of the
parties[4] and an amount in controversy greater than the statutory
minimum.    Venue is properly laid in the Western District of
Pennsylvania inasmuch as the events giving rise to the claims
occurred primarily in Hazelwood, Allegheny County, Pennsylvania,
within this district.    See 28 U.S.C. § 1391(a).

---

[4]    Mr. Lehman is a citizen and resident of Pennsylvania; Victoria is an
Ohio corporation with its principal place of business in Columbus, Ohio.
(Notice of Removal, Doc. No. 1, ¶¶ 5, 7.)

11

## III. STANDARD FOR SUMMARY JUDGMENT

A court may grant summary judgment if the party so moving can show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); Sollon v. Ohio Cas. Ins. Co., 396 F. Supp.2d 560, 568 (W.D. Pa. 2005). If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material. A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

In considering a motion for summary judgment, the court must view all evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and draw all reasonable inferences and resolve any conflicts in its favor. Sollon, id., *citing* Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). In short, the movant must show that if the pleadings, depositions and other evidentiary material were admissible at trial, the other party could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in the movant's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).

12

Once the movant has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." Celotex, id. at 322-323; Sollon, id.; Fed.R.Civ.P. 56(c). The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations, or mere suspicious beliefs. Liberty Lobby, id. at 250-252; Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).

A special burden of proof falls on the plaintiff in cases involving a claim brought under the Pennsylvania bad faith statute. That is, at trial the insured must prove the elements of the claim by clear and convincing evidence. See Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005); Terletsky v. Prudential Property & Casualty Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994), citing Cowden v. Aetna Casualty & Surety Co., 124 A.2d 223, 229 (Pa. 1957). Under Pennsylvania law, "[t]he standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." In re Sylvester, 555 A.2d 1202, 1203-1204

13

(Pa. 1989) (citations omitted); *see also* Lockhart v. State Farm Mut. Auto. Ins. Co., CA No. 08-993, 2010 U.S. Dist. LEXIS 12992, *17 (W.D. Pa. Feb. 16, 2010), and Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 752 (3d Cir. 1994). Consequently, at the summary judgment stage, the plaintiff's burden is "commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial." Babayan, 430 F.3d at 137 (internal quotation omitted); Williams v. Hartford Cas. Ins. Co., 83 F. Supp.2d 567, 571 (E.D. Pa. 2000); *see also* Terletsky, 649 A.2d at 688 (bad faith must be proven, "not merely insinuated.")

## IV.  **ANALYSIS**

### A.  Relevant Law[5]

Bad faith claims against insurance companies in Pennsylvania are governed by a statute which provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.

---

[5] The parties assume, and the Court agrees, that a court sitting in diversity applies the substantive law of the state in which it sits. *See* Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); Edwards v. HOVENSA, LLC, 497 F.3d 355, 361 (3d Cir. 2007).

14

(3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S. § 8371.

Under Pennsylvania law, "[b]ad faith claims are fact-specific and depend on the conduct of the insurer vis-a-vis its insured." Williams v. Nationwide Mut. Ins. Co., 750 A.2d 881, 887 (Pa. Super. Ct. 2000). The statute itself does not define bad faith, but the phrase in the insurance context has acquired a "peculiar and universally acknowledged meaning." Polselli, 23 F.3d at 751. The more common description of bad faith is that the insurer indulged a "frivolous or unfounded refusal to pay proceeds of a policy." Terletsky, 649 A.2d at 688). Alternatively, bad faith can be shown where the insurer failed to investigate the claim fairly and objectively, or where it did not conduct a reasonable investigation based on available information. *See* Giangreco v. United States Life Ins. Co., 168 F. Supp.2d 417, 423 (E.D. Pa. 2001), and Diamon v. Penn Mut. Fire Ins. Co., 372 A.2d 1218, 1226 (Pa. Super. Ct. 1977) (an insured is entitled to expect that the insurer will exercise reasonable care in investigating the claim and reject it only for good cause.) In short, "the crux of a bad faith claim under § 8371 is denial of coverage by an insurer when it has no good reason to do so." Jung v. Nationwide Mut. Fire. Ins., Co., 949 F.Supp. 353, 360 (E.D. Pa. 1997).

To succeed on a claim for bad faith, the plaintiff must establish by clear and convincing evidence that: (1) the insurer did not have a reasonable basis for denying coverage, and (2) the insurer knew or recklessly disregarded its lack of reasonable basis. *See* Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997), adopting the test set out in Terletsky, 649 A.2d at 688. Further, it is insufficient to establish "mere negligence or an incorrect analysis of the law;" rather, evidence of recklessness is required to support a finding of bad faith. Jung, 949 F.Supp. at 356, *citing* Polselli, 23 F.3d at 751.

B.    The Parties' Arguments

1.    *Defendant's arguments:*  Victoria argues that because Mr. Lehman cannot establish by clear and convincing evidence that its decision to deny coverage under the Policy was less than reasonable, this Court must find as a matter of law that it could not have acted in bad faith.  (Defendant's Memorandum of Law in Support of Motion for Partial Summary Judgment, Doc. No. 23, "Def.'s Memo," at 9.)    The Policy in effect at the time of the incident states in relevant part:

CONCEALMENT, MISREPRESENTATION OR FRAUD

This coverage form is void in any case of fraud by you at any time before or after a loss, as it relates to this coverage form.  It is void if you or any other insured, at any time, intentionally conceal or misrepresent any material fact concerning:

16

a.   this coverage form;

b.   this covered auto;

c.   your interest in the covered auto;

d.   a claim under this coverage form.

(Def.'s Memo at 9.)

According to Victoria, the evidence supports its conclusion that Mr. Lehman had made material misrepresentations as to the facts surrounding the events of November 15-16, 2008, and that those misrepresentations violated the above provision. Under Pennsylvania law, violation of such a fraud and concealment provision is a total bar to recovery. (Def.'s Memo at 9, citing, *inter alia*, Millard v. Shelby Cas. Ins. Co., CA No. 02-1902, 2005 U.S. Dist. LEXIS 45502, *11 (M.D. Pa. Aug 24, 2005).)

In its memorandum, Victoria identifies eight specific reasons why its claims managers decided certain statements Mr. Lehman had made were misrepresentations that precluded coverage:

The Pittsburgh police investigation conducted by Detective Synkowski found the incident to be suspicious and, as he advised Victoria, the police believed Lehman was lying.

There were no eyewitnesses to the alleged fight in the parking lot at Spencer's Down Under or to the theft of the truck, and the security cameras did not show the altercation, the theft, or the bikers who allegedly attacked Mr. Lehman.

17

Mr. Lehman appeared to have changed the details of his
story between the time he gave his initial statement to
Officer Petak and when he spoke to Detective Synkowski,
perhaps because in the interim, he had learned from
Spencer's owner that had the altercation occurred as he
initially reported, it would have been recorded on the
surveillance tapes.

Mr. Lehman made several contradictory statements to police
and Victoria during the course of the investigation,
specifically, the name of the bar where the altercation
occurred, the location of the fight (i.e., at the entrance
to the bar or at the entrance to the parking lot), the
subject which sparked the altercation, and when he
realized his truck was missing.

The statements of independent witnesses - the bartender,
Michelle Beal, and the owner of the bar, Thomas Exacustides
- undermined Mr. Lehman's credibility.

The hit-and-run accident only a few streets away from the
place where Mr. Lehman allegedly discovered his truck
provided a motive for someone driving under the influence
of alcohol to lie about his vehicle being stolen.

According to Detective Synkowski, when he inspected the
interior of the tow truck, it appeared nothing had been
disturbed as one might expect if the vehicle had been
stolen, e.g., the glove box was closed, its contents were
not disturbed, a few dollars were found in the center
console, and a police radio was still in place.

Victoria's investigation was through and included site
visits to Spencer's and the location where Plaintiff's
vehicle was found, interviews with Mr. Lehman, Mr.
Cordero, Ms. Beal, Mr. Exacustides, and several
individuals who lived in the neighborhood where the
vehicle was found.

(Def.'s Memo at 12-13.)

According to Defendant, many of Mr. Lehman's statements were
material in that they concerned subjects germane to Victoria's

18

investigation or were facts important to Victoria in its decision-making process. (Def.'s Memo at 13-14, *citing* Hepps v. General Am. Life Ins., CA No. 95-5508, 1998 U.S. Dist. LEXIS 13795, *10 (E.D. Pa. Sept. 2, 1998).) The cumulative, reasonable result of those misrepresentations was Victoria's decision to deny coverage. Moreover, Plaintiff has failed to elicit any evidence whatsoever that Victoria's decision was characterized by a dishonest purpose, breach of the duty of good faith and fair dealing, self-interest or ill will, and thus has failed to satisfy the second prong of the test set out in Terletsky.

      *2. Plaintiff's arguments:* In his brief in opposition to the motion for summary judgment, Mr. Lehman contends that the deposition testimony of Jason Balsomico, the Victoria investigator, and of Christian Harper, one of the Victoria claims managers who made the decision to deny coverage, supports his version of the events on November 15-16, 2008, and provides clear and convincing evidence that Victoria's investigation was neither complete nor reasonable. (Doc. No. 26, "Plf.'s Brief," at 1-2.) Mr. Lehman points to numerous instances where contrary to Defendant's argument that he materially misrepresented facts about what occurred that night, Mr. Balsomico and Mr. Harper conceded in their depositions that there were no inconsistencies either between what Plaintiff told the police and the insurance company or between his statements to the insurance

19

company on various occasions. (Plf.'s Brief at 2-6.) Moreover, Messrs. Balsomico and Harper conceded that Victoria failed to take numerous actions which could have confirmed Mr. Lehman's reports. (Id. at 7-17.) Plaintiff attacks each of the eight subject areas about which he allegedly made misrepresentations and concludes that at a minimum, his evidence raises genuine issues of material fact about Victoria's investigation. (Id. at 19-25.)

C.  Discussion

1.  *Victoria's failure to conduct a reasonable investigation:* Mr. Lehman provides a litany of investigative steps Mr. Balsomico conceded Victoria did not take during its investigation of his claim. For example, he did not:

ask Mr. Exacustides or Detective Synkowski if the surveillance tapes showed the area where Mr. Lehman stated the incident occurred or ask to look at the surveillance tapes himself;

discover the names of any patrons who were at Spencer's on the night of November 15 or ask any of them if they recognized someone going in or out of the bar;

interview the doorman on duty at Spencer's that night to confirm that he had not seen or heard the events described by Mr. Lehman;

verify that Mr. Lehman was at the wedding all day;

interview anyone who could have confirmed that Plaintiff and Mr. Cordero went to the motorcycle clubhouse after they left Spencer's;

discover any information to contradict Mr. Lehman's statement that he left the clubhouse between 4 and 5 a.m.;

20

discover any information to contradict the statements by Plaintiff and Mr. Cordero that they found the truck on Second Avenue or that Mr. Lehman drove the truck to Halbleib's; or

speak to Officer Petak to clarify the apparent inconsistencies between his initial report and the statements Mr. Lehman later made to Detective Synkowski and to Victoria representatives.

(Plf.'s Brief at 11-12, 21, 25.)

In short, Plaintiff argues, Mr. Balsomico's investigation was inadequate because he never investigated the facts as Mr. Lehman reported them to the police and to Victoria, but instead investigated something Plaintiff never said happened. Taken as a whole, Mr. Balsomico's investigation "confirms every aspect" of what Mr. Lehman told Victoria about the incident. (Plf.'s Brief at 25.)

Having considered the entirety of Mr. Balsomico's testimony at the preliminary criminal hearing and his deposition testimony (*see* Plf.'s App., Exhs. 1 and 3), the Court cannot dispute Plaintiff's assertions about specific actions Mr. Balsomico did not take during the course of his investigation. However, they are irrelevant even if Plaintiff is correct in every instance. As another court has held, an insurance company need not establish that its investigation "yielded the correct conclusion or even that its conclusion more likely than not was accurate." Neither does it need to show that the investigatory process was flawless or that the methods it used

21

eliminated all possibilities at odds with its conclusion. Cantor v. Equitable Life Assur. Soc'y of the United States, No. 97-5711, 1999 U.S. Dist. LEXIS 4805, *8 (E.D. Pa. Apr. 12, 1999). "Rather, an insurance company simply must show it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action." Id. at *9; see also Mann v. UNUM Life Ins. Co. of Am., CA No. 02-1346, 2003 U.S. Dist. LEXIS 23993 (E.D. Pa. Nov. 25, 2003) (although the investigation might have been more thorough if the insurer had spoken directly to the plaintiff's physicians, there was still a reasonable basis for denying coverage); McCrink v. Peoples Benefit Life Ins. Co., CA No. 04-1068, 2005 U.S. Dist. LEXIS 5072 (E.D. Pa. Mar. 29, 2005) (failure to interview two witnesses to an accident, inspect the motorcycle involved, and determine if the vehicle was operating properly prior to denying the claim was not bad faith where the insurer provided other evidence that its investigation was complete and thorough); and Wedemeyer v. United States Life Ins. Co., CA No. 05-6263, 2007 U.S. Dist. LEXIS 15742 (E.D. Pa. Mar. 6, 2007) (several omissions and oversights during the course of the insurer's investigation did not defeat summary judgment where there was ample record evidence showing the insurer conducted a thorough investigation and had a reasonable basis for terminating the plaintiff's disability benefits.)

According to the investigation log, between December 2, 2008, when Victoria was first advised of the loss and April 24, 2009, when it informed Mr. Lehman that it was denying coverage for the damage to his vehicle, Mr. Balsomico, the primary agent for Victoria, took the following steps during his investigation:

December 5, 2008 -- interviewed Mr. Lehman by telephone;

December 8, 2008 -- discussed the plan of action with Ms. Egleton and ran several internet searches about possible stolen vehicle claims and criminal records for Mr. Lehman;

December 9, 2008 -- went to Spencer's where he interviewed Ms. Beal, Mr. Exacustides and his wife, and took at least six photographs of the area where the theft allegedly occurred;

December 9, 2008 -- received a copy of the police report and spoke with Detective Synkowski about his review of the surveillance tapes and Officer Petak's report;

December 10-16, 2008 -- continued his research and spoke with Mr. Lehman and his attorney about arranging a second interview;

December 17, 2008 -- went to Second Avenue in Hazelwood where the vehicle was recovered, photographed the area and attempted unsuccessfully to find a resident who had seen the vehicle in the area at that time;

January 26, 2009[6] -- took a second statement from Mr. Lehman, reminded Mr. Lehman and his attorney that Plaintiff had not yet completed the affidavit of theft which had been previously sent to him, and spoke with Detective Synkowski about the interview, telling him that in accord with the detective's previous request, he would send a copy of the interview transcript to him;

---

[6] Between mid-December 2008 and mid-January 2009, Mr. Balsomico attempted several times to set a date for Mr. Lehman's interview after he was advised on December 16, 2008, that Plaintiff had engaged legal counsel.

February 3 through at least February 17, 2009 -- tried several times to interview Mr. Cordero who was either not available at the time Mr. Balsomico called or did not appear as scheduled;

February 5, 2009 -- interviewed Mr. O'Malley about the events of Sunday, November 16;

February 26, 2009 -- held a conference with other Victoria agents during which it was suggested that Mr. Balsomico contact Mr. Halbleib for policy information since it had not been provided by Mr. Lehman; and

February 27, 2009 -- went to Halbleib's Automotive and later talked with Mr. Halbleib who had no information regarding the incident other than what Mr. Lehman told him.

(Appendix in Support of Motion for Partial Summary Judgment, Doc. No. 25, "Def.'s App.," Exh. E, Deposition of Christian Harper, Exh. 1.)

It is true Mr. Balsomico did not take several of the steps Mr. Lehman suggests he should have taken as part of a complete and reasonable investigation. For example, he did not look at the surveillance tapes himself, but since Mr. Lehman told him the incident took place at the entrance to the parking lot and Mr. Exacustides and Detective Synkowski both confirmed that cameras were not positioned to photograph that area, such an action would have been futile. He did not interview anyone who could have confirmed that Mr. Lehman and Mr. Cordero went to the motorcycle clubhouse and remained there until between 4:00 and 5:00 a.m. but at his deposition, Mr. Lehman refused to provide the names of any members of the club,

24

so there is no reason to believe he would have provided that information to Victoria. (Def.'s App., Exh. A, Deposition of Earl Lehman, at 38.) Mr. Balsomico tried to find someone who could confirm the statements by Plaintiff and Mr. Cordero that they found the truck on Second Avenue by attempting to interview at least nine residents of the area, but was unsuccessful. In hindsight, although these and the other so-called "inadequacies" in the investigation could be considered negligent or indicative of poor judgment, they are insufficient to sustain a bad faith claim. *See* Luse v. Liberty Mut. Fire Ins. Co., No. 10-3363, 2011 U.S. App. LEXIS 2725, *7 (3d Cir. Feb. 11, 2011), *citing* Terletsky, 649 A.2d at 688 for the principle that "mere negligence or bad judgment is not bad faith."

To defeat a bad faith claim based on the failure to investigate properly, the insurer can show it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action. J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d Cir. 2004) ("A reasonable basis is all that is required to defeat a claim of bad faith.") We conclude that Plaintiff has not come forward with clear and convincing evidence that Victoria's investigation was not sufficiently thorough to support its ultimate conclusion to deny coverage.

2. *Victoria's erroneous conclusion that Plaintiff made inconsistent statements:* We turn to Plaintiff's second argument,

25

i.e., there were no material misrepresentations in Mr. Lehman's various reports and the testimony of Mr. Balsomico and Mr. Harper confirms that fact. Again, we agree with Defendant that several inconsistencies in his reports about the incident support Victoria's decision to deny coverage pursuant to the concealment provision of the Policy quoted above.

To point out the inconsistencies in the statements, we compare the details of Mr. Lehman's first report to the police on November 16, 2008, with those of his later reports to Detective Synkowski, Ms. Egleton, and Mr. Balsomico. The Court has used bold typeface to highlight the subjects of the inconsistencies.

According to the statement taken by Officer Petak on the afternoon of November 16, 2008, "**sometime around 1:00 a.m.** on November 16, 2008, Mr. Lehman "entered **Doug's Den** on Lebanon Road in West Mifflin." As he "**entered the bar** three white males in [their] 30's **walked [past] him** and began making comments about the **motorcycle vest that Lehman was wearing.**" He told the three men "F—k you," and they began fighting. He was knocked unconscious and was awakened by Mr. Cordero. He asked what had happened and **Mr. Cordero explained he was knocked out and his truck was missing.** They left **Doug's Den** and began to drive home, but decided to stop at the clubhouse and have a few more beers. Plaintiff and Mr. Cordero **left the clubhouse**

**at approximately 5:30 a.m.** and found his truck on Second Avenue. (Def.'s App., Exh. B, Deposition of Richard Petak, Exh. A.)

When speaking with Detective Synkowski on the afternoon of Tuesday, November 18, 2008, Mr. Lehman stated that **he left the wedding about 11 p.m.** and went to **Spencer's Down Under**. **"Out in the [parking] lot as he was coming in, a truck was pulling out** with three people in it. . . .Since they were in the middle of the road, **he yelled 'thanks' and the guys got out of the truck and started saying something about Greenfield boys."** He got out of his truck and struck one of them but was knocked out. The next thing he remembered was Mr. Cordero picking him up and taking him to the motorcycle clubhouse. They continued to party until **between 4:00 and 5:00 a.m. He asked Mr. Cordero to take him back to Spencer's for his truck, but it was not there. "While going home from Spencer's,"** they saw the truck on Second Avenue. (Def.'s App., Exh. C, Deposition of Edward Synkowski, Exh. A.)

Ms. Egelton interviewed Mr. Lehman on December 5, 2008. Plaintiff stated that after the wedding reception, **"I was supposed to meet a friend. . .[at] Spencer's Down Under."** As he **"pulled in,"** sometime about 11 o'clock, he got into an argument with three gentlemen **in another truck.** He was knocked unconscious. Mr. Cordero saw him **lying "in their driveway," i.e., "right there in the entrance as you come in,"** picked him up, and put him in his own

27

vehicle. When he came to (apparently after he was in the truck) he said to Mr. Cordero, "Get me out of here." He also stated to Ms. Egleton, **"I assume my truck was there, I don't even know."** They went to the clubhouse. As Mr. Lehman reported the conversation, **sometime around 4:00 or 5:00 a.m.**, he said, "Hey, **take me to my truck and [Mr. Cordero] said where's it at and [Mr. Lehman] said wasn't it there where you got me and he said no."** Mr. Lehman responded, "Just take me home." (Plf.'s App., Exh. 11, Transcript of telephone interview between Mary Egleton and Earl Lehman.)

Finally, on January 26, 2009, Mr. Balsomico interviewed Mr. Lehman for the second time. During that conversation, Mr. Lehman stated that the vehicle had to have been stolen **"somewhere around 11 o'clock"** and occurred, **"to the best of [his] knowledge at Spencer's Down Under right there as you're pulling in."** The argument started while he was **attempting to enter the parking lot.** Mr. Lehman stated that the other pickup truck "took up most of the driveway, I had to stop." When asked what the verbal argument was about, he stated, **"It was two drunk people yelling at each other. I don't remember precisely what it was. Something about I say hey, thanks for taking up the whole room, you know, something on that line and he said something, I said something and it just escalated."** The next thing he remembers was Mr. Cordero slapping him in the face. He said to his friend, "Just get me out of here," and they left. **He did not**

**think to look for his truck**. They got to the clubhouse sometime between 11:00 and 11:45 p.m. and stayed there until about **4:00 or 5:00 a.m**. when Mr. Lehman said to Mr. Cordero, **"Take me to my truck. He said where is [it] at, I said wasn't it there where you got me. He said no. I thought okay maybe I didn't take the truck there, I don't know. . . . Well, maybe [Mr. Cordero] had somebody take it home or whatever you know**. I don't know and I really can't tell you exactly why I didn't [call the police from the club] other than I've been drinking at that point for about 14 hours." (Plf.'s App., Exh. 11, Transcript of telephone interview between Jason Balsomico and Earl Lehman.)

We agree with Plaintiff that his reports to Detective Synkowski, Ms. Egleton, and Mr. Balsomico are, for the most part, consistent. In each of them he stated that the altercation took place at approximately 11 p.m. in the driveway or entrance to the parking lot at Spencer's Down Under;[7] that Mr. Cordero found him sometime later;

---

[7] We have given little weight to the fact that in Officer Petak's report, the bar in question is identified as "Doug's Down Under," or "Doug's Den," rather than "Spencer's Down Under." This is because, according to the statements of both Mr. Exacustides and Mr. Lehman, Plaintiff returned to Spencer's sometime on November 16, 2008. By contrast, there is no evidence he went to Doug's Den to check if that had been where the incident actually occurred, even after Detective Synkowski told him the surveillance tapes did not show any altercation in the parking lot at Spencer's that night, to which Mr. Lehman responded that perhaps he had been at another bar. *See* Def.'s App., Exh. A, Deposition of Earl Lehman at 39-40; Plf.'s App., Exh. 10, Deposition of Thomas Exacustides at 4-5; and Def.'s App., Exh. C, Deposition of Edward Synkowski, Exh. A.

they went to the clubhouse for more drinks; and they left the clubhouse sometime between 4:00 and 5:00 a.m.

But, the more telling discrepancies are between what Mr. Lehman told Officer Petak in the initial interview on the afternoon of November 16, immediately after the incident occurred, and what he told Detective Synkowski and the Victoria agents beginning on November 18, after he had returned to Spencer's and learned from Mr. Exacustides that the surveillance cameras would have photographed the entrance to the bar and the parking lot, but would not have recorded events which happened near Lebanon Road at the entrance to the parking lot. Specifically:

Mr. Lehman told officer Petak that the events began around 1:00 a.m.; he told everyone else that they occurred shortly after he left the wedding reception about 11:00 p.m.

According to the report to Officer Petak, Mr. Lehman was entering the bar and three men walked past him; he told the other investigators that the incident began while he and the other men were still in their vehicles at the point where the driveway and Lebanon Road intersect.

Mr. Lehman told Officer Petak that the precipitating event was the fact that the men commented about his motorcycle vest; he told Detective Synkowski that the incident began when he objected to the fact that the truck coming out of the parking lot was blocking his entrance, but told Mr. Balsomico he did not remember the event exactly, but it was "two drunk people yelling at each other."

According to Office Petak's report, Mr. Cordero told Mr. Lehman immediately upon restoring him to consciousness that his truck was missing, but Mr. Lehman told Detective Synkowski that they went to the motorcycle club apparently without discussing the location of his truck, told Ms.

30

Egleton that he "assumed" his truck was still at the bar when Mr. Cordero revived him, and told Mr. Balsomico that he "did not think to look for his truck."[8]

Plaintiff told Officer Petak he and Mr. Cordero left the clubhouse and headed directly to his home; he told Detective Synkowski he and Mr. Cordero had gone back to Spencer's to pick up his truck, but it was not there; and he told Ms. Egleton and Mr. Balsomico that Mr. Cordero had told him at the club that his truck had been missing when he picked him up at Spencer's.

We conclude that the inconsistencies between what Plaintiff told Officer Petak within a few hours of the incident and his reports to Detective Synkowski, Mr. Balsomico and Ms. Egleton could reasonably be considered material. We recognize that "[t]he question of materiality is generally considered one of fact and law, but if the facts misrepresented are so obviously important that reasonable minds cannot differ on the question of materiality, then the question becomes one of law that the court can decide at the summary judgment stage." Parasco v. Pacific Indemnity Co., 920

---

[8] Further inconsistencies on this point were introduced by Mr. Cordero. In his statement to Detective Synkowski on March 5, 2009, he said he found Mr. Lehman at Spencer's sometime between 4:00 and 5:00 a.m., the truck was gone, and as they drove from Spencer's toward Mr. Lehman's home, they found the vehicle on Second Avenue. (Def.'s App., Exh. 3, Deposition of Edward Synkowski, Exh. A.) At his deposition, Mr. Cordero said he had no plans to meet Mr. Lehman or go to Spencer's; he just happened to see Mr. Lehman standing in front of the bar as Mr. Cordero drove toward the riding club where everyone was supposed to meet. He picked up Mr. Lehman and as they drove to the clubhouse, he asked Mr. Lehman what had happened; Plaintiff told him he had been mugged but did not elaborate on the cause of the altercation. He did not see Mr. Lehman's vehicle at Spencer's and did not look for it. When they left the club, they went headed to Mr. Lehman's house and found the truck on Second Avenue. (Def.'s App., Exh. I, Deposition of Carl Cordero at 9-12.)

F.Supp. 647, 654 (E.D. Pa. 1996) (internal quotation omitted.) The most important facts – the location where the confrontation began (parking lot or entrance to the bar), what Mr. Lehman did upon regaining consciousness, and when he discovered the vehicle was not at Spencer's are all germane and important to Victoria's decision-making process and, as Mr. Harper testified, the inconsistencies in Mr. Lehman's reports were the basis of Defendant's decision to deny coverage. We conclude that Mr. Lehman has failed to establish by clear and convincing evidence that Victoria acted in bad faith by doing so.

## V.   **CONCLUSION**

This Court has an "ever-present obligation" throughout the course of the litigation to assure itself that it has subject matter jurisdiction, even if the parties do not raise the issue. Liberty Mut. Ins. Co. v. Ward Trucking Corp., 48 F.3d 742, 750 (3d Cir. 1995). Under Fed. R. Civ. P. 12(h)(3), a federal court must dismiss an action if it determines at any time it lacks jurisdiction. As the Rule indicates by use of the word "must," this action is mandatory. Moreover, dismissal under Rule 12(h)(3) does not require a motion by a party, but may be entered *sua sponte* by the Court. Pfizer, Inc., v. Ranbaxy Labs., Ltd., 525 F. Supp.2d 680, 684 (D. Del. 2007).

In his Complaint, Plaintiff raises two causes of action, breach of contract and the bad faith claim on which Victoria has just been

32

granted summary judgment.  Under the breach of contract claim, Mr. Lehman seeks the amount Victoria would be obligated to pay under the Policy for damage to his vehicle, that is, $18,000.  (Complaint, ¶¶ 9-11.)  As permitted by the bad faith statute, Mr. Lehman also seeks the amount of the repairs, interest from the date on which the claim was made, punitive damages, attorney's fees and costs.[9]  (Complaint, ¶¶ 12-16, *citing* 42 Pa. C.S. § 8371.)

It appears to the Court that with dismissal of the bad faith claim, one of the two requirements for subject matter jurisdiction under 28 U.S.C. § 1332, that is, an amount in controversy greater than $75,000 exclusive of interest and costs, is no longer met. Therefore, pursuant to 42 Pa. C. S. § 5103(b)(1), this case shall be remanded to the Court of Common Pleas of Allegheny County.

An appropriate Order follows.


June _16_ , 2011                    _William L. Standish_
                                    William L. Standish
                                    United States District Judge


---

[9]  Although the Complaint did not state a specific amount for punitive damages in Count II, indicating only that the amount sought was in excess of $25,000, when Plaintiff did not object to removal, the Court concluded that the combined total amount of his claims in Counts I and II was greater than $75,000.